969 F.2d 1350
 61 USLW 2081
 HAITIAN CENTERS COUNCIL, INC.; National Coalition for
Haitian Refugees, Inc.; Immigration Law Clinic of the
Jerome N. Frank Legal Services Organization of New Haven,
Connecticut; Dr. Frantz Guerrier; Pascal Henry; Lauriton
Guneau; Medilieu Sorel St. Fleur; Dieu Renel; Milot
Baptiste; Jean Doe; Roges Noel; on behalf of themselves
and all others similarly situated; A. Iris Vilnor;
Mireille Berger; Yvrose Pierre; and Mathieu Noel, on
behalf of themselves and all others similarly situated,
Plaintiffs-Appellants,
v.
Gene McNARY, Commissioner, Immigration and Naturalization
Service; William P. Barr, Attorney General; Immigration
and Naturalization Service; James Baker, III, Secretary of
State; Rear Admiral Robert Kramek; Admiral Kime;
Commandants, United States Coast Guard; and Commander, U.S.
Naval Base, Guantanamo Bay, Defendants-Appellees.
 No. 2023, Docket 92-6144.
 United States Court of Appeals,
Second Circuit.
 Argued June 26, 1992.
Decided July 29, 1992.
 
 Harold Hongju Koh, New Haven, Conn. (Drew S. Days, III, Paul W. Kahn, Anthony T. Kronman, Burke Marshall, Peter H. Schuck, Lowenstein Internt. Human Rights Clinic, Allard K. Lowenstein Intern. Human Rights Project, New Haven, Conn., Michael Ratner, Center for Constitutional Rights, New York City, Joseph Tringali, Jennifer Klein, Simpson Thacher & Bartlett, New York City, Robert Rubin, Ignatius Bau, San Francisco Lawyers' Committee for Urban Affairs, San Francisco, Cal., Lucas Guttentag, Judy Rabinovitz, Immigrants' Rights Project, American Civil Liberties Union, Akhil Reed Amar, New Haven, Conn., Michael J. Aprahamian, Michael S. Barr, J.D., Yale Law School, Graham A. Boyd, Raymond Brescia, Anupam Chander, Sarah H. Cleveland, Lisa M. Daugaard, Jonathan Ross, Paul Sonn, J.D.s, Yale Law School, Ethan Balogh, Eric Falkenstein, Bradley Karkainnen, John Newton, J.D. Candidates, Yale Law School, Norma E. Canas, J.D. Candidate, University of California at Berkeley Law School (Boalt Hall), of counsel), for plaintiffs-appellants.
 
 
 1
 Kenneth W. Starr, Sol. Gen., of the U.S., Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Andrew J. Maloney, U.S. Atty. E.D.N.Y., Scott A. Dunn, Asst. U.S. Atty., Brooklyn, N.Y., Michael Jay Singer, Robert V. Zener, Peter R. Maier, Malcolm L. Stewart, Attorneys, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., of counsel), for defendants-appellees.
 
 
 2
 Deborah E. Anker, Harvard Immigration Clinic, Cambridge, Mass. (Carolyn Patty Blum, University of California at Berkeley Law School (Boalt Hall), Berkeley, Cal., Joshua R. Floum, Nicholas W. van Aelstyn, Timothy R. Cahn, Roger W. Doughty, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., John Willshire-Carrera, Cambridge and Somerville Legal Services, Cambridge, Mass., of counsel), for amici curiae American Immigration Lawyers Ass'n and Nat. Immigration Project.
 
 
 3
 Kenneth Roth, New York City, for amicus curiae Americas Watch.
 
 
 4
 Paul L. Hoffman, Los Angeles, Cal. (Bartram S. Brown, Chicago-Kent College of Law, Chicago, Ill., of counsel), for amici curiae Amnesty Internl. and Amnesty Internl.--USA.
 
 
 5
 Nicholas deB. Katzenbach, Morristown, N.J. (Riker, Danzig, Scherer, Hyland & Perretti, of counsel), for amici curiae Haitian Service Organizations, Immigration Lawyers, and Members of Congress.
 
 
 6
 Arthur C. Helton, New York City (O. Thomas Johnson, Jr., Andrew I. Schoenholtz, Covington & Burling, Washington D.C., Carlos M. Vazquez, Georgetown University Law Center, Washington, D.C., of counsel), for amicus curiae The Lawyers Committee for Human Rights.
 
 
 7
 Julian Fleet, Office of the United Nations High Comm'r for Refugees, Washington, D.C. (Guy S. Goodwin-Gill, of counsel), for amicus curiae Office of United Nations High Comm'r for Refugees.
 
 
 8
 Mark Gibney, Dept. of Political Science, Purdue University, West Lafayette, Ind., for amicus curiae U.S. Committee for Refugees.
 
 
 9
 Before: NEWMAN, PRATT, and WALKER, Circuit Judges.
 
 GEORGE C. PRATT, Circuit Judge:
 
 10
 On May 23, 1992, President George Bush issued an executive order which allowed the Coast Guard to intercept boatloads of Haitian refugees at sea and to return them to their persecutors in Haiti. The narrow issue we decide on this appeal is whether the government's actions, taken to implement this order, comport with § 243(h)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(1). We hold that they do not.
 
 FACTS AND BACKGROUND
 
 11
 The factual and procedural background to this lawsuit, including the volatile political climate in Haiti, is well-chronicled in our prior decision, Haitian Centers Council, Inc. v. McNary, 969 F.2d 1326, 1329-1334 (2d Cir.1992) (HCCI ), familiarity with which is assumed. This particular appeal, however, concerns events that primarily took place after the record in that case had been developed.
 
 
 12
 On May 23, 1992, President Bush signed an executive order which has come to be known as the "Kennebunkport Order". In part, it reads as follows:
 
 
 13
 Section 1. The Secretary of State shall undertake to enter into, on behalf of the United States, cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea.
 
 
 14
 Sec. 2. (a) The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the Secretary of Defense, the Attorney General, and the Secretary of State, shall issue appropriate instructions to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens.
 
 
 15
 * * * * * *
 
 
 16
 (c) Those instructions to the Coast Guard shall include appropriate directives providing for the Coast Guard:
 
 
 17
 (1) To stop and board defined vessels, when there is reason to believe that such vessels are engaged in the irregular transportation of persons or violations of United States law or the law of a country with which the United States has an arrangement authorizing such action.
 
 
 18
 (2) To make inquiries of those on board, examine documents and take such actions as are necessary to carry out this order.
 
 
 19
 (3) To return the vessel and its passengers to the country from which it came, or to another country, when there is a reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist; provided, however, that the Attorney General, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent.
 
 
 20
 (d) These actions, pursuant to this section, are authorized to be undertaken only beyond the territorial sea of the United States.
 
 
 21
 Sec. 3. This order is intended only to improve the internal management of the Executive Branch. Neither this order nor any agency guidelines, procedures, instructions, directives, rules or regulations implementing this order shall create, or shall be construed to create, any right or benefit, substantive or procedural (including without limitation any right or benefit under the Administrative Procedure Act), legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person. Nor shall this order be construed to require any procedures to determine whether a person is a refugee.
 
 
 22
 * * * * * *
 
 
 23
 /s/George Bush
 
 THE WHITE HOUSE
 
 24
 May 23, 1992.
 
 
 25
 Exec. Order 12,807, 57 Fed.Reg. 23,133, 23,133-34 (1992) (emphasis added). Although the Kennebunkport Order did not specifically mention Haiti, the next day, when the order was released to the national news media, it was accompanied by a statement from the White House Press Secretary, which noted that the President had "issued an executive order which will permit the U.S. Coast Guard to begin returning Haitians picked up at sea directly to Haiti."
 
 
 26
 The Coast Guard followed orders, and immediately began to intercept numerous boatloads of Haitians in international waters, and to forcibly return them to Haiti without determining whether they would be thereupon persecuted.
 
 
 27
 On May 28, 1992, plaintiffs sought a temporary restraining order before Judge Johnson, challenging the actions under the new policy as ultra vires, as well as violative of (1) § 243(h)(1) of the INA, (2) Article 33 of the 1951 Convention relating to the Status of Refugees, (3) the 1981 U.S.-Haiti Executive Agreement, (4) the Administrative Procedure Act, and (5) the equal protection component of the fifth amendment's due process clause. The district court held a hearing, at which the plaintiffs presented not only evidence demonstrating the heightened political repression currently occurring in Haiti, but also evidence that specific plaintiffs who had been returned have since been abused, were tortured, and were hiding in fear of their lives.
 
 
 28
 Judge Johnson construed the plaintiffs' motion as one for a preliminary injunction. Although he called the United States' actions "unconscionable", "particularly hypocritical", and "a cruel hoax", he nonetheless denied the injunction. Relying on his prior decision that the right to counsel under 8 U.S.C. § 1362 and 8 C.F.R. § 208.9 is limited to aliens found in the United States, Judge Johnson concluded that "Section 243(h) is similarly unavailable as a source of relief for Haitian aliens in international waters." He also concluded that although "[o]n its face, Article 33 imposes a mandatory duty upon contracting states such as the United States not to return refugees to countries in which they face political persecution", our prior decision in Bertrand v. Sava, 684 F.2d 204, 218 (2d Cir.1982) held that the Convention's provisions are not self-executing; thus, Judge Johnson felt he could not grant plaintiffs the requested relief. He did not address the other issues raised by the plaintiffs.
 
 
 29
 We have jurisdiction over this expedited appeal under 28 U.S.C. § 1292(a)(1).
 
 DISCUSSION
 
 30
 Although this is an appeal from the denial of a preliminary injunction, only questions of law are presented, and our usual de novo review applies. There is no challenge to Judge Johnson's finding that "the Plaintiffs undeniably make a substantial showing of irreparable harm"; thus, if the district court's view of the law was incorrect, then an injunction should issue.
 
 
 31
 On appeal, the plaintiffs wield the full arsenal of arguments that they wielded in the district court--s 243(h) of the INA, Article 33 of the Refugee Convention, the 1981 U.S.-Haiti agreement, the APA, and the fifth amendment's equal protection component. The government addresses each of these contentions, and adds two of their own: (1) that since the subject plaintiffs are now back in Haiti, they stand in the same position as the "screened-out" plaintiffs in a similar federal action commenced in Florida, and are thus bound under principles of collateral estoppel by the eleventh circuit's holding in Haitian Refugee Center, Inc. v. Baker, 953 F.2d 1498 (11th Cir.) (per curiam ) (HRC v. Baker ), cert. denied, --- U.S. ----, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992); and (2) that the executive order falls within the President's constitutional powers as commander-in-chief and his inherent authority over foreign relations, and was issued "pursuant to an express or implied authorization of Congress." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).
 
 
 32
 We address the dispositive contentions in turn.
 
 
 33
 A. Preclusive Effect of HRC v. Baker.
 
 
 34
 The administration's policy toward Haitian refugees has been the subject of litigation in two actions, one brought in Florida and the other in New York. Classes of Haitian refugees have been certified in both actions. See Fed.R.Civ.P. 23(a), 23(b)(2). The class in the Florida action, certified on December 3, 1991, was defined as
 
 
 35
 all Haitian aliens who are currently detained or who will in the future be detained on U.S. Coast Guard cutters or at Guantanamo Naval base who were interdicted on the high seas pursuant to the United States Interdiction Program and who are being denied First Amendment and procedural rights.
 
 
 36
 This "Florida class" is focused primarily on Haitians who have been "screened out" (i.e. interviewed by INS officers and found not to have a credible fear of persecution upon return to Haiti), although we have previously noted that it was defined in an "overly broad" fashion which did not fairly and adequately represent the interests of the plaintiffs herein. See HCC I, at 1337. In contrast, the class in the New York action, conditionally certified on April 7, 1992, was defined as "All Haitians who have been or will be 'screened in' ". See id. at 1336.
 
 
 37
 In HRC v. Baker, the eleventh circuit was presented with a "claim that [the Florida class plaintiffs] have judicially enforceable rights under the INA because the defendants' actions violate 8 U.S.C. § 1253(h) as it was amended by the Refugee Act." 953 F.2d at 1509. The eleventh circuit concluded that the plaintiffs there (who were interdicted on the high seas but had not reached the United States, its borders, or any port of entry) could not assert a claim based on this section of the INA. Id. at 1510. Arguably, the eleventh circuit also passed upon the Article 33 issue. Cf. id. at 1508.
 
 
 38
 Plaintiffs identify three sub-groups within the New York class of "[a]ll Haitian citizens who have been or will be 'screened-in' " which are being harmed by the executive actions taken pursuant to the Kennebunkport order:
 
 
 39
 (1) some 150 Haitians who have been repatriated even though previously screened-in;
 
 
 40
 (2) thousands of Haitians with credible fears of persecution who are being or will be interdicted, but should have been screened-in; and(3) those Haitians on Guantanamo Naval Base who are now unscreened and would be screened-in but for the summary repatriation which the government may seek.
 
 
 41
 Additionally, there are other plaintiffs, screened out under the program that was in place prior to the Kennebunkport Order, who, although not members of the New York class certified by Judge Johnson, are nonetheless plaintiffs in this case. The government argues that all of these plaintiffs are enveloped in the Florida class, and are thus collaterally estopped from relitigating the § 243(h) issue and the Article 33 issue.
 
 
 42
 1. Different parties.
 
 
 43
 It is axiomatic that "a judgment in a properly entertained class action is binding on class members in any subsequent litigation." Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 874, 104 S.Ct. 2794, 2798, 81 L.Ed.2d 718 (1984) (citing, inter alia, RESTATEMENT (SECOND) OF JUDGMENTS § 41(1)(e) (1982)). Collateral estoppel, known also as "issue preclusion", "prevents the parties' relitigation of an issue that was (a) raised, (b) litigated, and (c) actually decided by a judgment in their prior proceeding". Prime Management Co. v. Steinegger, 904 F.2d 811, 816 (2d Cir.1990). To be bound by a prior judgment, a party in the subsequent litigation must have been a party to, or represented by a privy in, the prior action; otherwise, it would be a violation of due process to enforce the prior judgment against that party. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 & n. 7, 99 S.Ct. 645, 649 & n. 7, 58 L.Ed.2d 552 (1979).
 
 
 44
 We do not believe that any of the sub-groups of plaintiffs could fairly be characterized as a party to the Florida action; thus, the issues they present to us are not barred by collateral estoppel. As we have noted above, the Florida class of Haitian aliens had three requirements for membership:
 
 
 45
 (a) current or future detention on cutters or at Guantanamo Bay;
 
 
 46
 (b) interdiction "pursuant to the United States Interdiction Program", and
 
 
 47
 (c) denial of first amendment and procedural rights (i.e., the screening procedures).
 
 
 48
 Simply put, the plaintiffs here do not meet the second characteristic because they are not being interdicted "pursuant to the United States Interdiction Program" that was before the eleventh circuit, thus they do not fit within the definition of the Florida class. The plaintiffs here have been or will be interdicted pursuant to a different interdiction program. The one at issue in HRC v. Baker was a program of preliminary screening before return; the program put in place by the Kennebunkport Order is one of summary return without screening. This is a change sufficient to avoid the class definition in HRC v. Baker.
 
 
 49
 Judge Johnson defined the New York class as "All Haitians who have been or will be 'screened in' ". This phrasing necessarily encompasses two subgroups of Haitians threatened by persecution: those who had arrived prior to the certification of the class on April 7, 1992, and those who arrived, or will arrive, thereafter. All of those class members who "will be", but have not yet been, screened in, are necessarily persons who will be interdicted pursuant to the new program put in place by the Kennebunkport Order. If interdicted at sea and summarily repatriated, those class members will be denied screening.
 
 
 50
 There is at least one other person who is also outside the scope of the Florida class, but who is nonetheless a plaintiff in this case. A. Iris Vilnor is "a Haitian being held in detention on Guantanamo who has been 'screened out' by the INS." Complaint p 10, at 6, HCC v. McNary, No. CV-92-1258 (E.D.N.Y.). She purports to represent 8,000 other screened-out plaintiffs (the "Vilnor plaintiffs"). Although the plaintiffs in HRC v. Baker included screened-out Haitians, those plaintiffs were challenging the old program. Vilnor, and those she purports to represent, are challenging the new program, which was imposed under the Kennebunkport Order.
 
 
 51
 As to the Vilnor plaintiffs, the government claims that they have no interest in litigating the issues before us, because they have nothing to gain from a return to the old program. This argument, of course, is addressed to standing, not collateral estoppel, and in any event, the Vilnor plaintiffs do have standing because they are not on this motion asserting any right to an initial screening; rather, they are asserting a right, under § 243(h) of the INA and Article 33 of the Refugee Convention, not to be returned to Haiti. While screened-out before, this determination cannot be binding for all time, since political situations change. The Vilnor plaintiffs might well, upon a future interception, be found to have been threatened by persecution.
 
 
 52
 In sum, neither those plaintiffs who would be screened in, nor those plaintiffs who would be screened out but who are now being intercepted under the new interdiction program, are precluded by the HRC v. Baker litigation, as they were not members of the plaintiff class as defined in that case.
 
 
 53
 2. Change in circumstances.
 
 
 54
 Even if all of the requirements for issue preclusion are met, a court should nonetheless decline to give collateral estoppel effect to a prior judgment if there are "changes in facts essential to [the prior] judgment", Montana v. United States, 440 U.S. 147, 159, 99 S.Ct. 970, 976, 59 L.Ed.2d 210 (1979), or if "a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws." RESTATEMENT (SECOND) OF JUDGMENTS § 28(2) (1982). We have accepted the view put forth in the Restatement's § 28(2), Staten Island Rapid Transit Operating Auth. v. ICC, 718 F.2d 533, 543 (2d Cir.1983), as have other courts, e.g., Kania v. Fordham, 702 F.2d 475, 476 n. 2 (4th Cir.1983) ("Relitigation of an issue of public importance should not be precluded when there has been 'an intervening change in the applicable legal context.' "). Where pure, "unmixed questions of law" are presented in successive actions, "preclusion may be inappropriate", for "[u]nreflective invocation of collateral estoppel * * * could freeze doctrine in areas of the law where responsiveness to changing patterns of conduct * * * is critical." Montana v. United States, 440 U.S. at 162-63, 99 S.Ct. at 978. Accord Allen v. McCurry, 449 U.S. 90, 95 n. 7, 101 S.Ct. 411, 415 n. 7, 66 L.Ed.2d 308 (1980).
 
 
 55
 Especially where pure questions of law are presented, courts and commentators both have recognized that the interests of finality and judicial economy may be outweighed by other substantive policies, for in this circumstance "[t]he interests of courts and litigants alike can be protected adequately by the flexible principles of stare decisis." 18 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4425, at 244 (1981). See also United States v. Stauffer Chem. Co., 464 U.S. 165, 177, 104 S.Ct. 575, 582, 78 L.Ed.2d 388 (1984) (White, J., concurring) ("were consistency a compelling concern as between circuits, the decision of one circuit would bind the others even in litigation between two entirely different parties.")
 
 
 56
 As to those plaintiffs who are arguably members of the Florida class, we believe that the Kennebunkport Order represents "an intervening change in the applicable legal context", see RESTATEMENT (SECOND) OF JUDGMENTS § 28(2), which warrants "a new determination". Id. Since the dispositive question--whether § 243(h) of the INA applies to conduct of the United States outside of our territorial waters--is one purely of law, few judicial resources would be saved by collaterally estopping these plaintiffs from litigating this issue, and the public importance of the issue merits full consideration on the merits, especially in light of the events that have occurred since the eleventh circuit decided HRC v. Baker and the Supreme Court denied certiorari.
 
 
 57
 After prevailing in the eleventh circuit, the Solicitor General of the United States opposed certiorari in HRC v. Baker by representing to the Supreme Court "that 'screened in' individuals would be brought to the United States so that they could file applications under the [INA] for asylum." HCC I, at 1332. See also Brief for United States in Opposition to Certiorari at 3, HRC v. Baker, cert. denied, --- U.S. ----, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992) (same). After that representation, the Supreme Court denied certiorari on February 24, 1992, Justice Blackmun dissenting. See HRC v. Baker, --- U.S. ----, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992).
 
 
 58
 Only five days later, as we noted in HCC I, at 1332, the United States altered its policy in some respects, contravening the representation it had made to the Supreme Court. Then, scarcely two months later, the President issued the Kennebunkport Order, which made no pretense at all of adhering to the Solicitor General's prior representation to the Supreme Court. On the contrary, it permitted a policy, subsequently implemented, of no screening whatsoever.
 
 
 59
 A discretionary denial of review, of course, does not deprive a ruling of preclusive effect, see, e.g., RESTATEMENT (SECOND) OF JUDGMENTS § 28, comment a; but the circumstances surrounding the denial of certiorari in the Florida litigation weigh significantly against granting that judgment preclusive effect in this action. The Supreme Court may well have seen no need to review HRC v. Baker, given the government's representation that no alien with a colorable claim of asylum would be turned away. But when the United States (a) resists Supreme Court review on a dramatic issue of such public import (a fact noted by three justices upon the denial of certiorari, see 112 S.Ct. at 1245-46), by representing that there will be screening of intercepted aliens followed by full consideration of asylum rights, (b) achieves the desired denial of certiorari, and then (c) embarks on a completely contrary policy, that is a change of the type that ought to permit an inferior court, unfettered by estoppel, to adjudicate the merits of a new case based on the new circumstances.
 
 
 60
 As will be seen, infra, we disagree with the eleventh circuit's conclusion that § 243(h) of the INA does not apply to the return of refugees interdicted beyond the territorial waters of the United States. Since this creates an explicit "circuit split", the Supreme Court may see fit to grant certiorari on this case, cf. Sup.Ct.R. 10.1(a), and decide the issues which it declined to consider in HRC v. Baker. If it does, it will have the benefit of the carefully-considered, although contrary, views of two judicial circuits. The federal judicial hierarchy deserves this opportunity to consider this weighty issue on the merits, especially in light of the drastic changes in the legal context which have occurred since February 24, 1992.
 
 
 61
 Having concluded that we are not precluded in this case by the eleventh circuit's interpretation of § 243(h)(1) in HRC v. Baker, we proceed to address the merits of that issue.
 
 
 62
 B. Section 243(h)(1) of the INA.
 
 
 63
 Before 1980, § 243(h) of the INA read as follows:
 
 
 64
 The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time he deems to be necessary for such reason.
 
 
 65
 In 1980 this section was replaced by a new § 243(h), consisting of two subparagraphs which were part of the Refugee Act of 1980, Pub.L. No. 96-212, 94 Stat. 102. With that change, § 243(h)(1) reads thusly:
 
 
 66
 The Attorney General shall not deport or return any alien * * * to a country if the Attorney General determines that such aliens's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 67
 8 U.S.C. § 1253(h)(1). This new statute makes the following textual changes: it strips the attorney general of the discretion formerly granted him under the old § 243(h) and makes his obligations under this new section mandatory; it applies now to "any alien", rather than "any alien within the United States"; and instead of authorizing the attorney general to "withhold deportation", it states that he "shall not deport or return" an alien found to have been threatened by persecution.
 
 
 68
 These amendments to this statute present us with two problems of construction and interpretation. First, we must determine whether Haitians intercepted in international waters fall within the scope of "any alien" in § 243(h)(1). If so, we must turn to the second problem: whether intercepting Haitians in international waters and returning them to Haiti constitutes the "return" of an alien, conduct that would be impermissible under § 243(h)(1).
 
 
 69
 1. Congress has already resolved the first problem for us, for in § 101(a)(3) of the INA, 8 U.S.C. § 1101(a)(3), it has provided that, as used in the INA, "[t]he term 'alien' means any person not a citizen or national of the United States." The plain language of this provision makes clear that aliens are aliens, regardless of where they are located. Since the words of the statute are unambiguous, " 'judicial inquiry is complete.' " Connecticut Nat'l Bank v. Germain, --- U.S. ----, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (quoting Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). In light of this congressional definition, the plaintiffs in this case, who are citizens of Haiti, not of the United States, are plainly designated by the term "any alien", used by congress in § 243(h)(1).
 
 
 70
 Since the plain language of § 243(h)(1) and § 101(a)(3) appears to resolve the first statutory problem before us, we may turn to other canons of construction only to determine whether there is a "clearly expressed legislative intention" contrary to that language, which would require us to question the virtually-conclusive presumption that congress meant what it said. United States v. James, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986). But see INS v. Cardoza-Fonseca, 480 U.S. 421, 452, 107 S.Ct. 1207, 1223, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring) (only when the plain language leads to a "patent absurdity"); Union Bank v. Wolas, --- U.S. ----, 112 S.Ct. 527, 534, 116 L.Ed.2d 514 (1991) (Scalia, J., concurring) (only to find "a 'scrivener's error' producing an absurd result"). The government nevertheless tenders numerous reasons--the presumption against extraterritorial application, an assertedly inconsistent provision in § 243(h)(2)(C), § 243's placement in part V of the INA, and other provisions of the INA which expressly limit their application to aliens "within the United States"--to support its argument that § 243(h)(1) does not apply to these plaintiffs. We reject all of these arguments, none of which is sufficient to overcome the plain language of § 243(h)(1).
 
 
 71
 First, the presumption that laws of the United States have no extraterritorial application has no relevance in the present context. That presumption is a canon of construction "whereby unexpressed congressional intent may be ascertained", Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949) (emphasis added), which "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." EEOC v. Arabian American Oil Co., --- U.S. ----, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991). But congress knew "how to place the high seas within the jurisdictional reach of a statute", Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 440, 109 S.Ct. 683, 691, 102 L.Ed.2d 818 (1989), and it did so here by making § 243(h)(1) apply to "any alien" without regard to location. Additionally, comity is of reduced concern here, as the Haitians are being intercepted in international (i.e., non-sovereign) waters. We are thus not faced with the spectre of forum-shopping refugees coming into United States courts in order to enforce some right that courts in Haiti would not recognize; on the contrary, § 243(h)(1) may be invoked only in United States courts, and only against the United States government. Only when the United States itself acts extraterritorially does § 243(h)(1) have extraterritorial application. Absent proactive government intervention of the sort presented here, § 243(h)(1)'s ban on "return" of aliens to their persecutors could not be invoked by persons located outside the borders of the United States.
 
 
 72
 Second, the government points us to § 243(h)(2)(C) of the INA, which directs that the provisions of § 243(h)(1) shall not apply if "there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." 8 U.S.C. § 1253(h)(2)(C). The government argues that the language "prior to the arrival of the alien in the United States" means that § 243(h)(1) cannot apply to these plaintiffs, who have not arrived in the United States. We disagree.
 
 
 73
 To accept the government's reading of the statute, we would, in effect, be reading the words "within the United States" back into § 243(h)(1), which would counter congress's plainly expressed intent to eliminate those limiting words in 1980. The Supreme Court only recently reminded us of "the canon of statutory construction requiring a change in language to be read, if possible, to have some effect, see, e.g., Brewster v. Gage, 280 U.S. 327, 337, 50 S.Ct. 115, 117, 74 L.Ed. 457 (1930); 2A N. Singer, Sutherland Statutory Construction § 46.06 (5th ed. 1992)." American Nat'l Red Cross v. S.G., --- U.S. ----, ----, 112 S.Ct. 2465, 2475, 120 L.Ed.2d 201 (1992). Our reading, on the other hand, gives full vitality to all portions of § 243(h), as actually written by congress. True, the "serious nonpolitical crime" exception in § 243(h)(2)(C) does not apply to an alien who has not arrived in the United States, but that seems to be precisely what congress meant to accomplish. Not only is that the way they worded the exception, but it also comports with common sense. The United States would have a strong domestic interest in keeping alien criminals out of its territory (and out of its prisons), and a strong foreign policy interest in refraining from granting safe haven to non-political criminals fleeing from other countries.
 
 
 74
 Before 1980, § 243(h) distinguished between two groups of aliens: those "within the United States", and all others. After 1980, § 243(h)(1) no longer recognized that distinction, although § 243(h)(2)(C) preserves it for the limited purposes of the "serious nonpolitical crime" exception. The government's reading would require us to rewrite § 243(h)(1) into its pre-1980 status, but we may not add terms or provisions where congress has omitted them, see Gregory v. Ashcroft, --- U.S. ----, 111 S.Ct. 2395, 2404, 115 L.Ed.2d 410 (1991); West Virginia Univ. Hosps., Inc. v. Casey, --- U.S. ----, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991), and this restraint is even more compelling when congress has specifically removed a term from a statute: "Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded". Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 392-93, 100 S.Ct. 1723, 1742, 64 L.Ed.2d 354 (1980) (Stewart, J., dissenting) (quoted with approval in INS v. Cardoza-Fonseca, 480 U.S. at 442-43, 107 S.Ct. at 1219). "To supply omissions transcends the judicial function." Iselin v. United States, 270 U.S. 245, 250, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926) (Brandeis, J.).
 
 
 75
 The third reason urged by the government for not reading the statute literally, is that § 243(h)(1) is located in Part V of the INA. This argument similarly fails. Part V of the INA deals primarily with deportation and adjustment of status. The eleventh circuit relied on this fact--almost exclusively--to conclude that "[t]he provisions of Part V of the INA dealing with deportation only apply to aliens 'in the United States.' " HRC v. Baker, 953 F.2d at 1510 (citing, inter alia, 8 U.S.C. §§ 1251, 1253(a)). Putting aside the fact that it ignores the plain language of § 243(h), this argument ascribes entirely unwarranted weight to the location of the provision: of course, the provisions of Part V "dealing with deportation" must apply only to aliens "in the United States", since an alien must be "in" the "port" of a country in order to be "de-ported" from it. See generally 8 U.S.C. § 1251(a) ("Any alien * * * in the United States" may be deported if certain conditions are met); David A. Martin, Major Issues in Immigration Law 9-10 (Federal Judicial Center 1987).
 
 
 76
 The statute's location in Part V reflects its original placement there before 1980--when § 243(h) applied by its terms only to "deportation". Since 1980, however, § 243(h)(1) has applied to more than just "deportation"--it applies to "return" as well (the former is necessarily limited to aliens "in the United States", the latter applies to all aliens). Thus, § 243, which applies to all aliens, regardless of whereabouts, has broader application than most other portions of Part V, each of which is limited by its terms to aliens "in" or "within" the United States; but the fact that § 243 is surrounded by sections more limited in application has no bearing on the proper reading of § 243 itself. If anything, it has an effect opposite to what the government suggests: it tends to prove that if congress had meant to limit § 243(h)(1)'s scope to aliens "in the United States", it surely knew how to do that. " ' "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." ' " INS v. Cardoza-Fonseca, 480 U.S. at 432, 107 S.Ct. at 1213 (citations omitted).
 
 
 77
 Lastly, we reject the government's suggestion that since § 243(h) restricts actions of only the attorney general, the President might in any event assign the same "return" function to some other government official. Congress understood that the President's agent for dealing with immigration matters is the attorney general, see 8 U.S.C. § 1103(a); cf. Kleindienst v. Mandel, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972), and we would find it difficult to believe that the proscription of § 243(h)(1)--returning an alien to his persecutors--was forbidden if done by the attorney general but permitted if done by some other arm of the executive branch.
 
 
 78
 In sum on this point, the district court erred in concluding that § 243(h)(1) does not apply to aliens outside the United States. By drawing its conclusion from its earlier right-to-counsel ruling, the district court failed to appreciate the differences in the plain language of the two statutes. The INA's right-to-counsel provision, 8 U.S.C. § 1362, applies to "the person concerned" in "any exclusion or deportation proceeding[ ]", whereas, as we have already noted, § 243(h)(1) applies by its terms to a much broader class of persons--all "aliens", no matter where located.
 
 
 79
 2. Having concluded that § 243(h)(1) applies to all "aliens", we must face the other textual problem posed by the statute: whether the government's interception and forcible repatriation of Haitian refugees constitutes a "return" of those refugees to their persecutors in violation of § 243(h)(1). We conclude that it does.
 
 
 80
 Section 243(h)(1) prohibits the government from both deporting and returning an alien. Virtually all prior litigation under this subsection has focused on the term "deport"; not until the executive's recent actions in "reaching out" to repatriate Haitians has litigation attention shifted to the term "return", which is nowhere defined in the INA. Since congress provided no special definition, we must interpret § 243(h)(1) by "giving the 'words used' their 'ordinary meaning' ". Moskal v. United States, 498 U.S. 103, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990) (quoting Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)). The rule is no different for the INA: we " 'assume "that the legislative purpose is expressed by the ordinary meaning of the words used." ' " INS v. Phinpathya, 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984) (citations omitted).
 
 
 81
 Congress directed that the "Attorney General shall not * * * return any alien to a country" that would persecute the alien. When used, as here, in its transitive mode, the word "return" means "to bring, send, or put (a person or thing) back to or in a former position". Webster's Third New International Dictionary 1941 (1971). Here, congress has amplified the meaning of "return" by adding after the word "return", the prepositional phrase "to a country [where he would be persecuted]"; significantly, congress made no mention of where the alien (who may be anywhere, within or without the United States) must be returned "from". Of parallel significance, the Kennebunkport Order itself directs the Coast Guard to "return the vessel and its passengers to the country from which it came". (emphasis added). As we do with congress, we presume that the President of the United States uses words with their "ordinary meaning"; thus, when the "return" directed by the President is to a persecuting country, it is exactly the kind of "return" that is prohibited by § 243(h)(1) of the INA.
 
 
 82
 Since the plain language of § 243(h) demonstrates that what is important is the place "to" which, not "from" which, the refugee is returned, and since § 243(h)(1) by its terms (a) applies to all "aliens" regardless of their location, and (b) prohibits their "return * * * to a country" where they would likely be persecuted, we conclude that the executive's action of reaching out into international waters, intercepting Haitian refugees, and returning them without determining whether the return is to their persecutors, violates § 243(h)(1) of the Immigration and Nationality Act.
 
 
 83
 The government does not offer a contrary view of the term "return" in § 243(h)(1); rather, it argues that the 1980 amendment to § 243(h) merely "makes the language read like Article 33" which, the government assures us, prohibits the "return" only of refugees who have entered the territory of the contracting state. Thus, we must turn our attention to the government's reading of Article 33.
 
 
 84
 3. Article 33 of the Refugee Convention, which is entitled "Prohibition of expulsion or return ('refoulement')" reads:
 
 
 85
 1. No Contracting State shall expel or return ("refouler" ) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.
 
 
 86
 2. The benefits of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country.
 
 
 87
 United Nations Convention relating to the Status of Refugees, 189 U.N.T.S. 150, 176 (1954). Although the United States was not a party to the original Refugee Convention, the provisions of that Convention were nonetheless ratified by the United States when it acceded to the 1967 Protocol relating to the Status of Refugees ("Protocol"). 19 U.S.T. 6223, 6225.
 
 
 88
 The Supreme Court has recognized "that one of Congress' primary purposes [in passing the Refugee Act of 1980] was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, * * * to which the United States acceded in 1968." INS v. Cardoza-Fonseca, 480 U.S. at 436-37, 107 S.Ct. at 1216. See also INS v. Doherty, --- U.S. ----, 112 S.Ct. 719, 729, 116 L.Ed.2d 823 (1992) (Scalia, J., concurring) ("In 1980, Congress removed all doubt concerning the matter" of whether the Attorney General "honored the dictates" of Article 33.1); INS v. Stevic, 467 U.S. 407, 421, 104 S.Ct. 2489, 2496, 81 L.Ed.2d 321 (1984) (the Refugee Act of 1980 amended § 243(h), "basically conforming it to the language of Article 33 of the United Nations Protocol."); HCC I, at 1344 (same). Cf. United States Dept. of State v. Ray, --- U.S. ----, 112 S.Ct. 541, 543 n. 1, 116 L.Ed.2d 526 (1991) (footnote).
 
 
 89
 In construing treaties, we use principles analogous to those that guide us in the task of construing statutes. Cf. United States v. Stuart, 489 U.S. 353, 371, 109 S.Ct. 1183, 1194, 103 L.Ed.2d 388 (1989) (Scalia, J., concurring) (if "the Treaty's language resolves the issue presented, there is no necessity of looking further to discover 'the intent of the Treaty parties' "). Rather than having evolved from a judicial common law, however, principles of treaty construction are themselves codified, in Article 31 of the Vienna Convention on the Law of Treaties (also known as "the Treaty on Treaties"), 1155 U.N.T.S. 331, 8 I.L.M. 679 (1969), entered into force Jan. 27, 1980. Although the United States has not ratified the Vienna Convention, it is a signatory. We have previously applied the Vienna Convention in interpreting treaties, Day v. Trans World Airlines, Inc., 528 F.2d 31, 36 (2d Cir.1975) (Warsaw Convention), cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), as has the United States Department of State. See Letter from Edwin D. Williamson, Legal Adviser, Department of State, to Timothy E. Flanigan, Acting Assistant Attorney General 2 (Dec. 11, 1991) (regarding HRC v. Baker ).
 
 
 90
 As with statutes, treaties are to be construed first with reference to their terms' "ordinary meaning * * * in their context", and "in light of their object and purpose." Vienna Convention, art. 31(1). The plain meaning of treaty terms controls " 'unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." ' " United States v. Stuart, 489 U.S. at 365-66, 109 S.Ct. at 1191 (citations omitted). To stray from clear treaty language, there must be "extraordinarily strong contrary evidence". Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 185, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982). According to Article 32 of the Vienna Convention, "supplementary means of interpretation", which consist primarily of the preparatory and conclusory circumstances of a treaty (the international equivalent of legislative history) are to be turned to only as a last resort, and then only if the primary tools of interpretation enumerated in Article 31 of the Vienna Convention "leave[ ] the meaning ambiguous or obscure" or lead to a "manifestly absurd or unreasonable result."
 
 
 91
 The plain language of Article 33.1 of the Refugee Convention leads us to conclude that, just as with § 243(h)(1), the word "return" means "return", without regard to where the refugee is to be returned from, and, just as with § 243(h)(1), what is important under Article 33.1 is where the refugee is to be returned to. The Protocol's definition of "refugee" is extremely persuasive on this point. Under the Protocol, a "refugee" is "any person who * * * owing to a well-founded fear of being persecuted * * * is outside the country of his nationality". Thus, a "refugee" under the Protocol, just as with "any alien" under § 243(h)(1) of the INA, is defined not with regard to his current location but with regard to his past location.
 
 
 92
 Article 33.1's prohibition against "return" plainly applies to all refugees, regardless of location. This reading is borne out by the language used in other articles of the Refugee Convention that have a more limiting effect on the term "refugee". See, e.g., Article 4 ("refugees within their territories"); Article 15 ("refugees lawfully staying in their territory"); Article 17.1 (same); Article 18 ("refugee lawfully in their territory"); Article 19.1 ("refugees lawfully staying in their territory"); Article 21 (same); Article 23 (same); Article 24.1 (same); Article 26 ("refugees lawfully in its territory"); Article 27 ("refugee in their territory"); Article 28 ("refugees lawfully staying in their territory"); Article 31.1 (refugees who "enter or are present in their territory without authorization"); Article 32.1 ("refugee lawfully in their territory").
 
 
 93
 The government's position, that Article 33.1 applies only to refugees who have entered the territory of the contracting state, is therefore untenable in view of the plain language of that section. Had the parties to the Refugee Convention meant to limit its application in that way, we would expect a wording of that section in line with, for instance, Article 4 ("refugees within their territories"). But the contracting states did not so limit Article 33.1; instead, the term "a refugee" in Article 33.1 encompasses all "refugees". Accord Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 9 (1979) ("A person is a refugee within the meaning of the 1951 Convention as soon as he fulfils the criteria contained in the definition. This would necessarily occur prior to the time at which his refugee status is formally determined.").
 
 
 94
 This reading of Article 33.1 is further supported by the "object and purpose" not only of that article, but also of the Refugee Convention as a whole. It is clear that the purpose of Article 33.1 is to prevent all "refugees", "in any manner whatsoever", from being put into the hands of those who would persecute them. One of the considerations stated in the Preamble to the Convention is that the United Nations has "endeavoured to assure refugees the widest possible exercise of * * * fundamental rights and freedoms." The government's offered reading of Article 33.1, however, would narrow the exercise of those freedoms, since refugees in transit, but not present in a sovereign area, could freely be returned to their persecutors. This would hardly provide refugees with "the widest possible exercise" of fundamental human rights, and would indeed render Article 33.1 "a cruel hoax".
 
 
 95
 The Protocol, moreover, indicates that Article 33's non-refoulement obligation must be enforced as written. Although contracting states may make "reservations" as to the terms of other articles in the Refugee Convention, Article 33 is one of the few articles which may not be tampered with by the contracting states. See Protocol, art. VII.1. Additionally, Article I.3 of the Protocol provides that the "Protocol shall be applied by the States Parties hereto without any geographic limitation". In short, were we to accede to the government's offered reading of Article 33.1, we would be endorsing a reading so limited as to be fundamentally contrary to the Protocol's, and to the Refugee Convention's, "object and purpose" as expressed by the plain language.
 
 
 96
 The government nonetheless offers us numerous reasons to stray from the straight-and-narrow path of plain language. First, it argues that the inclusion of the French term "refouler", placed in parentheses after the word "return" in Article 33.1, "connotes ejection of an alien from within the territory of the Contracting State." Brief for United States at 40. In support of this argument, the government cites from Cassell's French Dictionary one of the many meanings of "refouler": "expel (aliens)"; and the government contends that a refugee cannot be expelled if he is not yet in a country.
 
 
 97
 Plaintiffs offer a somewhat different interpretation of "refouler" from the Dictionnaire Larousse, which suggests that it implies repelling or driving back an alien who has not yet entered. Similar meanings of "refouler" are found in Cassell's, the government's source. As the plaintiffs point out, the government's strained reading of Article 33.1 would forbid a state to "expel or expel" an alien. Recognizing this anomaly, the government responds by suggesting that "expel or return ('refouler' )" is to be read as a "unitary whole". However, the French text of the Refugee Convention (which, according to Article 46 of the Refugee Convention, is "equally authentic" to the English text) undercuts the government's reading; the French text ("Aucun des Etats Contractants n'expulsera ou ne refoulera"), by using "ou", meaning "or", conclusively shows that expel (expulsera ) and return (refoulera ) are to be read disjunctively, not as a "unitary whole".
 
 
 98
 The government, however, suggests that the plaintiffs' reading of "refouler" renders the word "expel" superfluous, since "return" would then encompass all modes of return, by expulsion or otherwise. The government may actually be correct in this assumption, but the contracting states had good reason to specifically include "expel", for under the Refugee Convention, it is a term of art. Article 32, which is entitled "Expulsion", forbids a contracting state to "expel a refugee lawfully in their territory". If Article 33.1 had not contained the word "expel", it might not have been as clear that it applied to that specific manner of "return" in addition to other manners. Accord Guy S. Goodwin-Gill, The Refugee in International Law 69 (1983) ("Refoulement is thus to be distinguished from expulsion or deportation, the more formal process whereby a lawfully resident alien may be required to leave a state, or be forcibly ejected therefrom.").
 
 
 99
 The second reason that we should stray from the plain language of Article 33.1, says the government, is that the President has interpreted the article as not applying to "persons located outside the territory of the United States", Exec. Order 12,807, 57 Fed.Reg. at 23,133, and his interpretation, says the government, "is entitled to great weight." See, e.g., Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. at 185, 102 S.Ct. at 2379. However, it is by no means conclusive. Id. at 184, 102 S.Ct. at 2379.
 
 
 100
 In this case, the executive branch's interpretation of Article 33.1 appears to be much closer to a litigating posture than it is to an authoritative interpretation, and in any event it diverges markedly from the clear language of the Refugee Convention. Moreover, "it is not clear here precisely what position of the [executive] this court ought to defer to", Lewis v. Grinker, 965 F.2d 1206, 1220 (2d Cir.1992), since the executive has previously read Article 33.1 in a contrary fashion. In a December 11, 1991, letter to Acting Assistant Attorney General Timothy E. Flanigan, which was "Re: Haitian Refugee Center, Inc. v. Baker ", the Legal Adviser of the Department of State wrote:
 
 Dear Tim:
 
 101
 I am writing to provide you with the formal opinion of the Department of State on the question whether the non-refoulement obligation of Article 33 of the 1951 U.N. Convention Relating to the Status of Refugees ("the Refugee Convention") imposes obligations on the United States with respect to refugees outside United States territory. We have previously and publicly taken the position that the obligation applies only to persons within the territory of a Contracting State. This remains our firm view. For the reasons indicated below, the Department respectfully requests that you reconsider and withdraw the apparently contrary legal conclusion reflected in the opinion of the Office of Legal Counsel of August 11, 1981.
 
 
 102
 Acting Assistant Attorney General Flanigan concurred in the Department of State's request in a letter sent the next day, although that letter seemed to rely more extensively on the fact that, in the attorney general's view, the Protocol was not self-executing. What is clear from this exchange of letters is that the attorney general, at least from August 11, 1981, until Haitian Refugee Center v. Gracey, 600 F.Supp. 1396 (D.D.C.1985), aff'd on other grounds, 809 F.2d 794 (D.C.Cir.1987), took the position that Article 33.1's nonrefoulement provisions did apply outside the territory of the United States. See 5 Op. Off. Legal Counsel 242, 248 (1981) ("Individuals [intercepted on the high seas] who claim that they will be persecuted * * * must be given an opportunity to substantiate their claims [under Article 33.1]."). Given the facts that the executive branch has taken two contrary positions on Article 33.1's prohibition of refoulement, and that the second interpretation was "the sort of post hoc litigation posture that is entitled to no deference", Lewis v. Grinker, at 1220, we would not feel justified in viewing the second interpretation as the sort of "extraordinarily strong contrary evidence" needed to nullify the plain language of Article 33.1.
 
 
 103
 Third, the government argues that its reading of Article 33.1 is actually supported by the text of Article 33, and of the Convention, as a whole. We reject this contention as well. Article 33.2 carves out an exception to Article 33.1, much like § 243(h)(2)(C) of the INA does with § 243(h)(1). However, it does not follow that all refugees covered by Article 33.1 are potentially subject to the Article 33.2 exception; on the contrary, the latter section is limited (for good reasons of national security) to refugees "in" a certain country. Moreover, the government's argument that the geographical limits that are placed on "refugees" in other areas of the Convention tacitly limit the use of "refugee" in Article 33.1 actually supports a contrary reading, as we have noted, supra. With the usual apologies to Cicero, Article 33.1's silence on geographic limitation shouts loudly its proper meaning. Cf. Greenberg v. Board of Governors, 968 F.2d 164, 171 (2d Cir.1992).
 
 
 104
 The government's fourth and final assault on the clear language of the Refugee Convention comes in the form of what Justice Scalia recently called "that last hope of lost interpretive causes, that St. Jude of the hagiology of statutory construction, legislative history." United States v. Thompson/Center Arms Co., --- U.S. ----, 112 S.Ct. 2102, 2111, 119 L.Ed.2d 308 (1992) (Scalia, J., concurring). In this regard, the government relies on the negotiating history of the Refugee Convention, as well as the circumstances of the United States' accession to the Protocol.
 
 
 105
 The government's argument is essentially the same argument put forth by Judge Edwards in his thoughtful and scholarly concurrence in Haitian Refugee Center v. Gracey, 809 F.2d 794, 839-41 (D.C.Cir.1987). There, Judge Edwards relied exclusively on the negotiating history of the Refugee Convention to conclude that "Article 33 in and of itself provides no rights to aliens outside a host country's borders." Id. at 840. The linchpin of the government's (and of Judge Edwards') argument is the statement of the Netherlands' representative at the final reading of the draft Refugee Convention, which appears id. at 840 n. 133. For convenience, we reproduce it below:
 
 
 106
 Baron van BOETZELAER (Netherlands) recalled that at the first reading the Swiss representative had expressed the opinion that the word "expulsion" related to a refugee already admitted into a country, whereas the word "return" ("refoulement" ) related to a refugee already within the territory but not yet resident there. According to that interpretation, article 28 would not have involved any obligations in the possible case of mass migrations across frontiers or of attempted mass migrations.
 
 
 107
 He wished to revert to that point, because the Netherlands Government attached very great importance to the scope of the provision now contained in article 33. The Netherlands could not accept any legal obligations in respect of large groups of refugees seeking access to its territory.
 
 
 108
 At the first reading the representatives of Belgium, the Federal Republic of Germany, Italy, the Netherlands and Sweden had supported the Swiss interpretation. From conversations he had since had with other representatives, he had gathered that the general consensus of opinion was in favour of the Swiss interpretation.
 
 
 109
 In order to dispel any possible ambiguity and to reassure his Government, he wished to have it placed on record that the Conference was in agreement with the interpretation that the possibility of mass migrations across frontiers or of attempted mass migrations was not covered by article 33.
 
 
 110
 There being no objection, the PRESIDENT [of the Conference] ruled that the interpretation given by the Netherlands representative should be placed on record.
 
 
 111
 Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Record of the Thirty-fifth Meeting, U.N. Doc. A/CONF. 2/SR. 35, at 21 (July 25, 1951) (emphasis in original).
 
 
 112
 This presents the biggest possible pitfall in the use of legislative history: what do we do when the legislative history is ambiguous? Although Judge Edwards concluded that this legislative history was an "agree[ment]", see Haitian Refugee Center v. Gracey, 809 F.2d at 840, the above-quoted passage is ambiguous on even this point. The Netherlands' representative asked that it be placed on record "that the Conference was in agreement" with his interpretation, but the President ruled only that "the interpretation given by the Netherlands representative should be placed on record." Judge Edwards' reading of this passage is a fair one; it would, however, be an equally-fair reading to see this passage as simply recording the views of a dissenting member. This is the view of amicus Office of the United Nations High Commissioner for Refugees, whose Handbook on Procedures and Criteria for Determining Refugee Status "provides significant guidance in construing the Protocol". INS v. Cardoza-Fonseca, 480 U.S. at 439 n. 22, 107 S.Ct. at 1217 n. 22.
 
 
 113
 Moreover, the concern of the Netherlands' representative is that his country "could not accept any legal obligations in respect of large groups of refugees seeking access to its territory." He may well have meant only that his country would be free to close its borders in the face of a threat of mass migration, leaving fleeing refugees the opportunity to make their way (by land or air) to some other haven. But his concern not to accept "any legal obligations", even if shared by others considering the treaty, would not have meant that his country could go beyond the negative act of closing its border and take the affirmative steps of seizing refugees approaching the border and forcibly carrying them back to the custody of those from whom they are fleeing.
 
 
 114
 Thus, even if we were to turn statutory construction on its head, and look to the words of the statute only when the legislative history is unclear, we would have to draw the same conclusion: Article 33.1 applies to all refugees, just as § 243(h)(1) of the INA applies to all aliens, no matter where found.
 
 
 115
 C. Article II Powers and Other Justifications for the Kennebunkport Order.
 
 
 116
 Finally, the government offers numerous reasons why the summary return of Haitians is authorized by law. We find none of these arguments sufficient to overcome the will of congress as expressed in § 243(h)(1) of the INA, for "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter". Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring).
 
 
 117
 The government suggests that both the President's constitutional position as "Commander in Chief of the Army and Navy of the United States", U.S. Const. art. II, § 2, cl. 1, and his "inherent authority as ' "the sole organ of the nation in its external relations" ' ", Brief for United States at 27 (quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936), in turn quoting Annals of Congress, 6th Cong., col. 613 (Mar. 7, 1899)), justify the Kennebunkport Order. We disagree.
 
 
 118
 The Supreme Court said, in United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950), that "[t]he exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." But the reason for that rule is absent here, for this case does not deal with the sovereign right "to turn back from our gates any alien or class of aliens." Id. at 550, 70 S.Ct. at 316 (Jackson, J., dissenting). To the contrary, when seized, these aliens were far from, and by no means necessarily heading for, our gates.
 
 
 119
 Similarly, we reject the government's arguments that §§ 212(f) and 215(a)(1) of the INA, which allow the President to "suspend the entry of all aliens or any class of aliens" and to place such "reasonable rules, regulations * * * limitations and exceptions" on the entry of aliens as he deems appropriate, also allow him to order the summary return to their persecutors of aliens intercepted on the high seas. The President's power to regulate "entry" into the United States is not questioned on this appeal. Even though the executive's actions have the practical effect of prohibiting some Haitians' entry into the United States, they also have the effect of prohibiting the Haitians from gaining entry into the Bahamas, Jamaica, Cuba, Mexico, the Cayman Islands, or any other country in which they might seek safe haven. By enforcing the INA's prohibition against forcible return of refugees, we leave unimpaired the President's authority to regulate entry into this country.
 
 
 120
 The government says that this is "an absurd result", since, under this reading, "the President could authorize the Coast Guard to block the path of Haitian vessels sailing toward Miami and force them back to sea without regard for their safety, but could not return them to land." Brief for United States at 30. We do not see the absurdity. This argument fails because it embraces two unwarranted assumptions--one express, the other not. While some intercepted Haitians may in fact be heading for Miami, some may also be heading toward other nations. The government's actions prevent the Haitians from seeking asylum in any country. Also, the unstated premise--that returning these Haitians to their persecutors is somehow "in regard for their safety"--is itself absurd.
 
 
 121
 Likewise, while the President is entitled to lead the country's external relations, he apparently did not view the Kennebunkport Order as addressing a foreign policy concern; on the contrary, the executive order specifically states that it was "intended only to improve the internal management of the Executive Branch." Exec. Order 12,807, 57 Fed.Reg. at 23,134. In any event, congress, wielding its "complete", "plenary" legislative power over immigration matters, see Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909); Boutelier v. INS, 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967), has spoken directly to the question at issue so that "[t]his is a job for the Nation's lawmakers, not for its military authorities." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at 587, 72 S.Ct. at 867. Similarly, we reject any suggestion that the Kennebunkport Order was issued "pursuant to an express or implied authorization of Congress", id. at 635, 72 S.Ct. at 870 (Jackson, J., concurring), for we can hardly infer congress's permission for the executive to do what it expressly forbade him from doing by § 243(h)(1) of the INA.
 
 
 122
 The government also argues that the Kennebunkport Order draws on the authority that congress gave to the Coast Guard to compel compliance with the laws of the United States on the high seas, including the power to use "all necessary force to compel compliance." 14 U.S.C. § 89(a). According to the government, the Haitians are somehow violating the INA's prohibition on illegal entry while afloat on the international waters of the Windward Passage. This argument is perplexing at best, and in any event provides no ground for sustaining the current interdiction program.
 
 
 123
 Lastly, although not raised in so many words, there is an undercurrent in the government's brief to the effect that this case presents a "political question" which is beyond the scope of judicial decisionmaking. We strongly disagree, for this case involves a determination of whether the current interdiction program itself (a creation of an executive order and thus of law, see Acevedo v. Nassau County, NY, 500 F.2d 1078, 1084 n. 7 (2d Cir.1974)) is consistent with a federal statute. As our discussion above amply illustrates, there exists no "lack of judicially discoverable and manageable standards" to apply. See Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). "The federal courts may review a case such as this one to insure that 'the executive departments abide by the legislatively mandated procedures.' " Haitian Refugee Center v. Gracey, 809 F.2d at 838 n. 116 (Edwards, J., concurring) (quoting International Union of Bricklayers v. Meese, 761 F.2d 798, 801 (D.C.Cir.1985)).
 
 CONCLUSION
 
 124
 The plain language of § 243(h)(1) of the Immigration and Nationality Act clearly states that the United States may not return aliens to their persecutors, no matter where in the world those actions are taken. In view of this, plaintiffs' arguments regarding the self-executing nature of Article 33.1 of the Refugee Convention are largely academic, since § 243(h)(1) provides coextensive protection.
 
 
 125
 In light of our conclusion that § 243(h)(1) prohibits the actions at issue, we need not address the plaintiffs' remaining arguments in favor of reversal. The order of the district court is reversed, and the case is remanded to the district court with instructions to enter an injunction prohibiting the defendants from returning to Haiti any interdicted Haitian whose life or freedom would be threatened on account of his or her race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 126
 Reversed and remanded with instructions. The mandate shall issue forthwith.
 
 
 127
 JON O. NEWMAN, Circuit Judge, with whom GEORGE C. PRATT, Circuit Judge, joins, concurring:
 
 
 128
 I concur in Judge Pratt's opinion and add these few words primarily to clarify what I believe is the significance to the collateral estoppel issue of the Government's shift from the position it took when it successfully opposed certiorari in Haitian Refugee Center v. Baker, 949 F.2d 1109 (11th Cir.1991) ("HRC"), to the position it now takes with regard to interdiction. The Government persuaded the Supreme Court not to review the Eleventh Circuit's decision by assuring the Court that it would screen Haitian refugees and bring to this country those who qualified for asylum. Having made that representation to insulate from review a decision that the screening policy was lawful, the Government now asks us to apply collateral estoppel to a lawsuit challenging the new policy of returning Haitians without screening--a policy Judge Pratt and I believe is unlawful. If we were to accede to that argument, we would be letting the Government keep the Eleventh Circuit ruling from the Supreme Court on a promise that is no longer being honored and then let the Government keep our decision from the Supreme Court by asserting that we had correctly applied collateral estoppel. That would be gamesmanship of the rankest sort, especially inappropriate in a lawsuit affecting people's lives.
 
 
 129
 Judge Walker, in dissent, misperceives the point of our discussion of the Government's change of position from what it asserted in opposition to certiorari in Baker. First, he points out that the plaintiffs are not entitled to certiorari. That is true, but entirely beside the point. We are not suggesting that the HRC plaintiffs were entitled to have the Supreme Court review the Eleventh Circuit's decision. We are suggesting that the Government cannot fend off such review on a promise to pursue one policy, then abandon that policy, and then use that unreviewed decision, insulated from review by a representation no longer being honored, to obtain a collateral estoppel ruling from this Court as to the lawfulness of the new policy. I do not question the Government's right to change its mind. But I do question its right to secure a litigating benefit from the position it previously asserted and then, after it has abandoned that position, to secure another litigating benefit in this Court.
 
 
 130
 Judge Walker also suggests that what the plaintiffs are really arguing is that the Supreme Court should apply some sort of equity argument to grant review of the collateral estoppel ruling he believes we should make in this case. But that is not at all what the plaintiffs are arguing. They are not so easily gulled. They understand that the issue is not whether some generous certiorari review should be applied to our collateral estoppel ruling. Instead, the issue is whether we should apply collateral estoppel in the first place. We should not do so, especially since we disagree on the merits with the Eleventh Circuit and since the Government has now abandoned the promise it made to the Supreme Court in fending off review of that Circuit's ruling.
 
 
 131
 With respect to the merits, I wish to add only one point. Judge Walker maintains that section 243(h) is confined to the territorial limits of the United States because its reach is co-extensive with section 208(a), which establishes asylum procedures for "an alien physically present in the United States or at a land border or port of entry," 11 U.S.C. § 1158(a) (1988). I can readily agree that the two provisions are co-extensive in most of their applications. When Congress drafted both sections 208(a) and 243(h), it was most likely thinking primarily of those who would arrive at our shores seeking asylum. The idea that our country would seize aliens in foreign lands or on the high seas and return them to their persecutors was probably not in the contemplation of most legislators. But the language of section 243(h), like the language of the UN Protocol that it implements, goes one step beyond the scope of section 208(a): It forbids our country from laying hands on an alien anywhere in the world and forcibly returning him to a country in which he faces persecution.
 
 
 132
 Unlike section 243(h), the asylum procedure of section 208(a) is explicitly limited to those in our territory. But asylum procedures for entry of an alien do not operate in the same manner as the prohibition on returning an alien to face persecution. Asylum is a discretionary decision of the Attorney General. No alien, even one who satisfies the standard of "refugee," has a right to asylum, or a right to enter the United States. See Immigration and Naturalization Service v. Cardoza-Fonseca, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 1211 n. 5, 94 L.Ed.2d 434 (1987) ("It is important to note that the Attorney General is not required to grant asylum to everyone who meets the definition of refugee.") (emphasis in original). If denied asylum, he may not enter; he may go elsewhere, or, in an extreme case, languish at our border. Cf. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (excluded alien detained at Ellis Island). But the command of section 243(h) is absolute: the alien shall not be returned to face persecution. That command cannot be circumvented by seizing the alien as he approaches our border, whether by land or by sea, and returning him to his persecutors.
 
 
 133
 JOHN M. WALKER, Jr., Circuit Judge, dissenting:
 
 
 134
 The plight of the Haitian plaintiffs in this case, whose desperation forces them onto the ocean in unseaworthy boats, escapes no one who considers the issues presently before us. I believe, however, that plaintiffs have already had a day in court on these issues and are collaterally estopped from seeking another. Even if they were not, plaintiffs cannot succeed in their challenge to the government's interdiction and repatriation policy implemented pursuant to a May 23, 1992 Executive Order. See Exec. Order 12,807, 57 Fed.Reg. 23,133 (1992) (the "May 23, 1992 Order"). Plaintiffs rely on § 243(h) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1253(h) (Supp.1992), and Article 33 of the United Nations Convention relating to the Status of Refugees, 189 U.N.T.S. 150 (1954) ("Article 33"). These provisions, however, bind the United States only with respect to aliens who have physically reached our territory. They grant no rights to plaintiffs in this case who have been or will be interdicted on the high seas. Whatever the merits of the policy of interdiction and return, as part of the United States response to the foreign policy crisis precipitated by the fall of the Haitian government in September, 1991 and the ensuing mass migration of Haitians in boats, I sit not as a policymaker but as a judge. I believe that the law does not support plaintiffs' claim. I respectfully dissent from the opinion of the majority granting plaintiffs' request for injunctive relief.
 
 I. Collateral Estoppel
 
 135
 The first question on this appeal is whether Haitian Refugee Center v. Baker collaterally estops plaintiffs from raising certain issues. See Haitian Refugee Center, Inc. v. Baker, 789 F.Supp. 1552 (S.D.Fla.1991), rev'd, 949 F.2d 1109 (11th Cir.1991) (per curiam) ("HRC v. Baker I "), on remand, 789 F.Supp. 1579 (S.D.Fla.1991), rev'd, 953 F.2d 1498 (11th Cir.1992) ("HRC v. Baker II "), cert. denied, --- U.S. ----, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992). "Under the doctrine of collateral estoppel ... the judgment in [a] prior suit [between the parties or their privies] precludes relitigation of issues actually litigated and necessary to the outcome of the first action." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). "Once a party has fought out a matter in litigation with another party, he cannot later renew that duel." Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).
 
 
 136
 Collateral estoppel applies to class actions. Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 874, 104 S.Ct. 2794, 2798, 81 L.Ed.2d 718 (1984). Indeed, the important judicial interests in consistency, finality and economy that underlie the doctrine, see Parklane Hosiery, 439 U.S. at 326, 99 S.Ct. at 649; 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4416 at 138-39 (1981) ("Wright & Miller"), apply with particular force in the class action setting. "The policy behind the class action device is, of course, to facilitate the final determination of numerous claims in one suit. This policy is not furthered by allowing subsequent collateral attacks by class members." Garcia v. Board of Ed., Sch. Dist. No. 1, 573 F.2d 676, 679 (10th Cir.1978). Moreover, the government may well have relied on HRC v. Baker in instituting the major policy initiative set forth in the May 23, 1992 Order. This further accentuates the need for consistency and finality.
 
 
 137
 A. Plaintiffs are collaterally estopped.
 
 
 138
 Collateral estoppel "prevents the parties' relitigation of an issue that was (a) raised, (b) litigated, and (c) actually decided by a judgment in their prior proceeding." Prime Management Co., Inc. v. Steinegger, 904 F.2d 811, 816 (2d Cir.1990). The HRC v. Baker judgment meets all three criteria. In HRC v. Baker, as in the current case, a class of Haitians sued officials of the United States government which, pursuant to Executive Order 12,324, 46 Fed.Reg. 48,109 (Sept. 29, 1991), reprinted in 8 U.S.C.A. § 1182 (West Supp.1992), was "screening" interdictees to determine their refugee status. The HRC v. Baker plaintiffs claimed that the government's procedures did not accord them the full screening rights to which they were entitled under law. Pursuant to this claim, they argued that INA § 243(h) extends extraterritorially, Article 33 is self-executing, and that the Administrative Procedure Act accords them judicial review. The Eleventh Circuit, in upholding the government's limited screening procedures, decided each of these issues in the government's favor. See HRC v. Baker I, 949 F.2d at 1110; HRC v. Baker II, 953 F.2d at 1505-1506, 1509-10. These issues, which are present in the current case, were therefore "raised," "litigated" and "actually decided" in HRC v. Baker, and collateral estoppel should apply. See Prime Management Co., 904 F.2d at 816. My colleagues, however, do not accept this position and I address each of their concerns in turn.
 
 
 139
 B. Is the present class distinct from the HRC v. Baker class?
 
 
 140
 To begin with, the majority concludes that the two classes are different: "We do not believe that any of the sub-groups of plaintiffs could fairly be characterized as a party to the Florida action; thus, the issues they present to us are not barred by collateral estoppel." Majority Op. at 1355. I do not agree.
 
 
 141
 The HRC v. Baker class, as certified, consisted of:
 
 
 142
 all Haitian aliens who are currently detained or who in the future will be detained on U.S. Coast Guard Cutters or at Guantanamo Naval base who were interdicted on the high seas pursuant to the United States Interdiction Program and who are being denied First Amendment and procedural rights.
 
 
 143
 In the present case, the district court certified a class of "all Haitian citizens who have been or will be screened in." Since, under the interdiction policy, a plaintiff must be detained before he or she is screened in, it follows that the class of all those "who have been or will be screened in" is wholly contained within the class of all those "who are currently detained or will in the future be detained." The present class thus fits neatly within the HRC v. Baker class.
 
 
 144
 The majority, however, focuses on the terms "United States Interdiction Program." The panel states that the present plaintiffs "have been or will be interdicted pursuant to a different interdiction program. The one at issue in HRC v. Baker was a program of preliminary screening before return; the program put in place by the Kennebunkport Order is one of summary return without screening." The majority summarily concludes that "[t]his is a change sufficient to avoid the class definition in HRC v. Baker." Majority Op. at 1355.
 
 
 145
 I cannot accept this artificial distinction. To begin with the obvious, it seems to me that the terms "United States Interdiction Program" refer to the policy under which plaintiffs were interdicted and not the screening policy to which they were later subject. The term "interdiction program," as it is used elsewhere in the HRC v. Baker plaintiffs' complaint, is consistent with this reading. See Second Amended Complaint, HRC v. Baker, 789 F.Supp. 1552 (No. 91-2653-Civ), p 2 ("Under an 'interdiction program,' the Coast Guard and the Immigration and Naturalization Service ('INS') intercept vessels on the high seas believed to be carrying Haitian aliens, many of whom meet the standard for political asylum and who seek refuge in our country."). Moreover, the majority neglects to mention that the two Executive Orders, which purportedly create two entirely separate programs, were issued pursuant to a single Proclamation dated September 29, 1981 and entitled "High Seas Interdiction of Illegal Aliens." Proclamation No. 4865, 46 Fed.Reg. 48,107 (1981), reprinted in 8 U.S.C.A. § 1182 (West Supp.1992). I read "United States Interdiction Program" to refer to the unitary program undertaken pursuant to Proclamation 4865. The HRC v. Baker complaint bears out this reading. See Second Amended Complaint, HRC v. Baker, 789 F.Supp. 1552 (No. 91-2653-Civ), p 32 ("On September 29, 1981 the President issued Proclamation 4865 ... which announced a program of 'interdiction: on the high seas of vessels transporting aliens.' "). The government's interdiction policy, which has continued unabated both before and after the May 23, 1992 Order, thus constitutes one program, not two.
 
 
 146
 Even if I could distinguish between a pre- and a post-May 23, 1992 "United States Interdiction Program," I would not find this distinction "sufficient to avoid the class definition in HRC v. Baker." Majority Op. at 1355. Where the parties are in all material respects the same and stand in an identical position vis-a-vis the issues, a purely formal distinction in the naming of the class will not enable a party to avoid issue preclusion. "Where the issues in separate suits are the same, the fact that the parties are not precisely identical is not necessarily fatal. As stated in Chicago, R.I. & P. Ry. Co. v. Shendel, 270 U.S. 611, 620, 46 S.Ct. 420, 423, 70 L.Ed. 757 (1926), 'Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different ... and parties nominally different may be, in legal effect, the same.' " Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402, 60 S.Ct. 907, 916, 84 L.Ed. 1263 (1940); see also St. Louis Typographical Union v. Herald Company, 402 F.2d 553, 556 (8th Cir.1968). In another formulation of this principle, it has been stated that a party is "privy" to another, and hence bound by issue preclusion, if he or she is "so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved." Jefferson School of Social Science v. Subversive Activities Control Bd., 331 F.2d 76, 83 (D.C.Cir.1963) (citing cases); see also Donovan v. Estate of Fitzsimmons, 778 F.2d 298, 301 (7th Cir.1985); Gill and Duffus Serv., Inc. v. A.M. Nural Islam, 675 F.2d 404, 405 n. 3 (D.C.Cir.1982); United States v. Truckee-Carson Irrigation Dist., 649 F.2d 1286, 1303 (9th Cir.1981); Southwest Airlines Co. v. Texas Int'l Airlines, 546 F.2d 84, 95 & n. 38 (5th Cir.1977), cert. denied, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977).
 
 
 147
 These principles require issue preclusion in the present case. The issues before us--the scope of INA § 243(h); the self-executing nature of Article 33; and judicial review under the APA--are identical to those before the HRC v. Baker court. Moreover, as a practical matter, the only asserted difference between the classes is that the HRC v. Baker class received some minimal screening rights prior to return, whereas the current plaintiffs receive none. The issues with which we are concerned, however, do not in any way turn on the existence or non-existence of a minimal screening. Nor does the minimal screening granted the HRC v. Baker plaintiffs have any bearing on the parties' incentive to litigate the issues. Thus, both classes stand in precisely the same legal position and assert the same legal interests with respect to the issues involved. Whether or not the identity of the parties varies slightly in form, it is the same in substance. Sunshine Anthracite Coal, 310 U.S. at 402, 60 S.Ct. at 916. I therefore conclude that collateral estoppel applies. Cf. Montana v. United States, 440 U.S. 147, 159-61, 99 S.Ct. 970, 976-77, 59 L.Ed.2d 210 (1979) (issue preclusion applies even where facts have changed if prior judgment not premised on those facts).
 
 
 148
 C. Have There Been Intervening Changes in the Legal Context?
 
 
 149
 The majority, without further explanation, concludes that "the Kennebunkport Order represents 'an intervening change in the applicable legal context' " which renders issue preclusion inapplicable. Majority Op. at 1356. I believe that the panel opinion misapplies this exception to issue preclusion.
 
 
 150
 Section 28(2)(b) of the Restatement (Second) of Judgments (1982) states that relitigation of an issue is not precluded where "a new determination is warranted in order to take account of an intervening change in the applicable legal context...." The paradigmatic case, as presented in the Restatement, is that of a taxpayer held liable for tax under a certain interpretation of the law, where that interpretation is later abandoned in favor of another which would not require liability. If, after this "intervening change," the taxpayer once again challenges his liability, the Restatement advises that issue preclusion should not apply so that "the taxpayer will be treated in those years in the same way as other taxpayers...." Restatement (Second) of Judgments, § 28 cmt. c (1982). See also Commissioner v. Sunnen, 333 U.S. 591, 599-600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948); 18 Wright & Miller § 4425 at 259-60.
 
 
 151
 The "intervening change" exception protects a party from being bound by a prior litigation where the legal grounds upon which that prior litigation was resolved have changed during the intervening period. In the present case, while the May 23, 1992 order no doubt constitutes a significant change in the lives of those affected by it, it has no bearing on the merits of the legal issues decided in HRC v. Baker and cannot constitute an "intervening change" in the law upon which that decision was grounded. Thus, the May 23, 1992 Order is not an "intervening change in the applicable legal context," Restatement (Second) of Judgments § 28(2)(b) (emphasis added), and does not enable plaintiffs to avoid issue preclusion.
 
 
 152
 D. Would Issue Preclusion Result in Inequitable Administration of the Laws?
 
 
 153
 Finally, the majority concludes that a new determination of the issues is necessary "to avoid inequitable administration of the laws." Restatement (Second) of Judgments § 28(2)(b) (1982). The panel believes that the Supreme Court may have premised its denial of certiorari in HRC v. Baker on the government's representation that it would bring screened-in individuals to the United States for further asylum proceedings. The government later deviated from this representation by holding second interviews at Guantanamo Bay for Haitians with communicable disease, such as the HIV virus, see Haitian Centers Council, Inc. v. McNary, Nos. 92-6090, 92-6104, slip op. 4371, 4382, 1326 F.2d 1332-1333 (2d Cir. June 10, 1992), and by inadvertently returning some screened-in Haitians to Haiti. The panel also makes the assertion, which I find unwarranted, that the May 23, 1992 Order further violated this representation by "permitt[ing] a policy, subsequently implemented, of no screening whatsoever." Majority Op. at 1357. The panel concludes that, under these circumstances, application of collateral estoppel would inequitably deny plaintiffs the opportunity for Supreme Court review.
 
 
 154
 One problem with this argument is that plaintiffs are not entitled to certiorari, which is granted on a discretionary basis. But even if the argument were that the government had inequitably dampened plaintiffs' chances of attaining Supreme Court review, it seems to me that the proper redress is to be found in the Supreme Court, not this one. Plaintiffs have no cause to argue that this court should fail to apply collateral estoppel. After all, there is no dispute that they received full appellate court review in HRC v. Baker. Their argument must be that they were denied a full opportunity to gain Supreme Court review on the merits, and that that Court, in deciding whether to hear an appeal from our collateral estoppel ruling, should, for reasons of equity, take the case up on the merits as well. Equity does not require that we hesitate to apply collateral estoppel. In sum, I believe that the HRC v. Baker litigation operates as collateral estoppel with respect to the following issues: (1) whether INA § 243(h) applies extraterritorially, see HRC v. Baker II, 953 F.2d at 1509-10; (2) whether Article 33 is self-executing, see HRC v. Baker I, 949 F.2d at 1110; and (3) whether the Administrative Procedure Act gives plaintiffs a right to judicial review, see HRC v. Baker II, 953 F.2d at 1503-1506. The HRC v. Baker court decided all three issues against plaintiffs.
 
 
 155
 II. The Merits.
 
 
 156
 The majority holds that section 243(h)(1) of the Immigration and Nationality Act and Article 33 of the Convention relating to the Status of Refugees support plaintiffs' request for injunctive relief. I believe that these provisions do not apply to aliens on the high seas. Thus, even if HRC v. Baker did not collaterally estop plaintiffs, I would dissent on the merits.
 
 
 157
 A. Ambiguity in § 243(h)(1).
 
 
 158
 Prior to 1980, INA § 243(h), 8 U.S.C.A. 1253(h) (1970), read:
 
 Withholding of deportation
 
 159
 (h) The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.
 
 
 160
 The Refugee Act of 1980, Pub.L. No. 96-212, 94 Stat. 102 (1980), amended the provision to read, in pertinent part, as follows:
 
 
 161
 (h) Withholding of deportation or return
 
 
 162
 (1) The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(4)(D) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 163
 8 U.S.C. § 1253(h) (Supp.1992).
 
 
 164
 The Supreme Court has pointed out that the 1980 amendments effected three important changes in § 243(h):
 
 
 165
 The amendment (1) substituted mandatory language for what was previously a grant of discretionary authority to the Attorney General to withhold deportation after making the required finding; (2) substituted a requirement that the Attorney General determine that the 'alien's life or freedom would be threatened' for the previous requirement that the alien "would be subject to persecution," and (3) broadened the relevant causes of persecution from reasons of "race, religion or political opinion" to encompass "nationality" and "membership in a particular social group" as well.
 
 
 166
 INS v. Stevic, 467 U.S. 407, 421 & n. 15, 104 S.Ct. 2489, 2496 & n. 15, 81 L.Ed.2d 321 (1984).
 
 
 167
 The panel believes that the plain language of the provision effects a fourth major change, not noted by the Supreme Court: extension of the provision's reach beyond United States territory. Prior to the 1980 amendments, INA § 243(h) applied only to those in deportation proceedings who were "within the United States." See Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). The panel, however, concludes that the Refugee Act's addition of the words "or return," and its deletion of the phrase "within the United States," make § 243(h)(1) applicable to aliens outside the territorial United States. The majority believes that the plain language unambiguously supports this reading thereby foreclosing review of the legislative history. See Majority Op. at 1358, 1361-1362.
 
 
 168
 I find the plain language ambiguous. While the majority correctly states that the § 243(h)(1) term "any alien," as defined at 8 U.S.C. § 1101(a)(3) (1988), contains no geographic restrictions, Majority Op. at 1358, these words do not require the majority's position. Congress used the same term "any alien" in § 243(h) before the 1980 amendments where, at least since the 1958 Barber case, there has been no question as to its non-extraterritorial application. Moreover, § 243(h)(1), as amended in 1980, states that "[t]he Attorney General shall not deport ... any alien," 8 U.S.C. § 1253(h)(1) (emphasis added). Yet no one could seriously contend (and the majority does not contend) that § 243(h)(1) proscribes the "deportation" of aliens on the high seas. As I shall have occasion to explain below, an alien can only be "deported," in the technical sense of that term, from United States territory. See infra at 1357-1358. The term "any alien" cannot have a different meaning in § 243(h)(1) depending upon whether it is the object of the verb "deport" or "return". The key question, and to me the only question of statutory interpretation necessary to decide this case, therefore, is whether § 243(h)(1) similarly prohibits "return" only from United States territory. If the term "return" does contain such a limitation, then the words "any alien" cannot alter it.
 
 
 169
 The majority acknowledges, as it has to, that the statute does not define where § 243(h)(1) prohibits "return" from. The panel concludes, however, that "what is important is the place 'to' which, not 'from' which, the refugee is returned." Majority Op. at 1362. This reasoning fails on two grounds. First, "our immigration laws have long made a distinction" between those aliens within our territory, and those outside of it. Barber, 357 U.S. at 187, 78 S.Ct. at 1073. In light of this history, the majority errs by dismissing such distinctions as not "important". Secondly, the majority's approach flies in the face of the well-established principle that where the statute is silent on a key interpretive issue "we must look past the text to ... [the] legislative history." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Congress' silence as to the location from which § 243(h)(1) prohibits return thus requires that we consult the legislative history.
 
 
 170
 Even if the plain language did unambiguously support plaintiffs' position I would find that "there is a "clearly expressed legislative intention' contrary to that [plain] language." United States v. James, 478 U.S. 597, 606, 106 S.Ct. 3116, 3122, 92 L.Ed.2d 483 (1986). Under either rationale, I believe that examination of the legislative history is necessary. I turn now to that task.
 
 
 171
 B. The legislative history clarifies the word "return".
 
 
 172
 The Refugee Act of 1980 did extend the scope of INA § 243(h), but not as broadly as the majority supposes. Briefly stated, the legislative history demonstrates that Congress intended, by means of the word "return," to expand the provision to encompass "excludable," as well "deportable," aliens. Excludable aliens, like deportables, are "physically present in the United States." Li v. Greene, 767 F.Supp. 1087, 1088 (1991). Thus, while Congress did broaden the provision's reach it did not expand it to aliens physically outside of United States territory. Section 243(h)(1) as amended does not cover aliens interdicted on the high seas such as the plaintiffs in this case who are neither deportable nor excludable.
 
 
 173
 1. The terminology of immigration law.
 
 
 174
 A proper understanding of § 243(h)(1) requires some familiarity with the concepts "deportation" and "exclusion" as used in immigration law. The basic distinction is straightforward. An alien who has "entered" the United States is subject to deportation proceedings. An alien "who is physically present in the United States, without making a legal entry," however, is subject to exclusion proceedings. Li v. Greene, 767 F.Supp. 1087, 1088 (1991); see also, e.g., Leng May Ma v. Barber, 357 U.S. 185, 187-88, 78 S.Ct. 1072, 1073-74, 2 L.Ed.2d 1246 (1958) (exclusion proceedings appropriate for alien who has not made legal entry even "though the alien is physically within the United States"); Bertrand v. Sava, 684 F.2d 204, 205 n. 1 (2d Cir.1982) (defining an excludable alien as one "who has reached our border but has not been formally permitted to enter the country. Even though physically present in the country, he is 'treated as if stopped at the border.' ") (citation omitted); Ledesma-Valdes v. Sava, 604 F.Supp. 675, 680 (S.D.N.Y.1985) ("Excludees, although physically present in the United States, are 'treated as if stopped at the border.' "). An alien who has not yet physically entered United States territory is, of course, subject neither to deportation nor exclusion proceedings.
 
 
 175
 To complicate matters a bit, deportation is sometimes referred to as "expulsion" and has occasionally been used loosely to encompass both expulsion and exclusion proceedings. Use of the term deportation to encompass exclusion, however, "reflects none of the technical gloss accompanying its use as a word of art...." Barber, 357 U.S. at 187, 78 S.Ct. at 1073; see also Bertrand, 684 F.2d at 205 n. 1. For present purposes, we properly distinguish between "deportation" and "exclusion" as these different concepts are recognized in immigration law.
 
 
 176
 "Entry," the status which renders an alien subject to deportation as opposed to exclusion, involves:
 
 
 177
 (1) a crossing into the territorial limits of the United States, i.e. physical presence; 2(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.
 
 
 178
 Correa v. Thornburgh, 901 F.2d 1166, 1171 (2d Cir.1990) (quoting Matter of Ching and Chen, Interim Decision 2984, at 3 (BIA 1984)). Thus, in practical terms, if the government wishes to remove an alien whom it has inspected and admitted at the border, or who has evaded inspection, and who is in United States territory "free[ ] from official restraint," id., it may do so only through deportation proceedings. Where the government has detained the alien at a border crossing, an airport or on a ship, physically within United States territory or territorial waters but without an "entry" having been effected, it may remove him or her pursuant to an exclusion hearing. This is true even where the Attorney General has "paroled" a detainee into the country. See 8 U.S.C. § 1182(d)(5) (Supp. II 1990). In the eyes of the law, such a person is deemed "stopped at the border," Shaughnessy v. Mezei, 345 U.S. 206, 215, 73 S.Ct. 625, 631, 97 L.Ed. 956 (1953), and is not "within the United States," Barber, 357 U.S. at 189, 78 S.Ct. at 1074, even though physically present. The distinction is important because, as we have noted, "[d]eportation proceedings are generally more favorable to the alien than exclusion proceedings." Correa, 901 F.2d at 1171 n. 5; see also Maldonado-Sandoval v. INS, 518 F.2d 278, 280 n. 3 (9th Cir.1975).
 
 
 179
 2. The 1980 Amendments to INA § 243(h).
 
 
 180
 Prior to 1980, § 243(h) protected a refugee, in the Attorney General's discretion, only against "deportation ... to any country in which in his opinion the alien would be subject to persecution...." 8 U.S.C.A. § 1253(h) (1970). In Leng May Ma v. Barber, 357 U.S. 185, 187-89, 78 S.Ct. 1072, 1074-75, 2 L.Ed.2d 1246 (1958), the Supreme Court accordingly held that § 243(h) covered only deportable, and not excludable, aliens. See also INS v. Stevic, 467 U.S. 407, 415, 104 S.Ct. 2489, 2493, 81 L.Ed.2d 321 (1984).
 
 
 181
 The Refugee Act of 1980 opened up § 243(h) to excludables. The House Report explains quite clearly that "section 203(e) [of the Refugee Act] amends section 243(h) of the Act, relating to withholding of deportation, to require (with some exceptions) the Attorney General to withhold deportation of aliens who qualify as refugees and who are in exclusion as well as deportation proceedings." H.R.Rep. No. 608, 96th Cong., 1st Sess., 30 (1979) (emphasis added). This piece of legislative history goes a long way towards answering the interpretive question before us. It demonstrates that Congress intended to broaden § 243(h)(1) to apply to excludables, but did not extend the provision to aliens outside United States territory.
 
 
 182
 In addition, the reference to excludables clarifies the meaning of "return." To bring excludables within the terms of § 243(h) Congress had to change the statutory language in two ways. First, it had to delete the words "within the United States" which, the Supreme Court had held, covered only deportables. See Barber, 357 U.S. at 188, 78 S.Ct. at 1074. Secondly, it had to modify the word "deportation" since this term, too, limited the scope of § 243(h) to deportables, not excludables. Id. at 187-90, 78 S.Ct. at 1074-75. To signify the intended broader scope Congress therefore added the words: "or return." Statutes and case law had previously used "return" in this manner. See 8 U.S.C.A. § 1182(a)(26) (1970) (discussing "return [of excludable alien] to country from which he came"); 8 U.S.C.A. § 1182(d)(6) (1970) ("[t]he Attorney General shall prescribe conditions ... to control and regulate the admission and return of excludable aliens...."); Barber, 357 U.S. at 187, 78 S.Ct. at 1073 (describing "the return of excluded aliens from the country"); United States v. Murff, 176 F.Supp. 253, 256 & n. 13 (S.D.N.Y.1959) ("The return of aliens who seek and who are denied admission into the United States is governed by the exclusion provisions, whereas the deportation of aliens ... is governed by the expulsion provisions of the act."). Thus, just as "deport" refers to deportables, Congress intended "return" to refer to excludables.
 
 
 183
 The legislative history provides additional support for this reading. For example, Congress' decision in the 1980 amendments to continue to address the provision to the "Attorney General," 8 U.S.C. § 1253(h)(1) (Supp.1992), indicates that § 243(h)(1) as amended was to be applied to deportables and excludables, aliens over which the Attorney General had operational jurisdiction, and not to other refugees or potential refugees outside United States territory who might be encountered by other United States government personnel, be they Coast Guard, military, or the like.
 
 
 184
 Moreover, the INA grants excludables and deportables the right to seek judicial review but does not provide review for aliens outside United States territory, see 8 U.S.C. §§ 1105a, 1157 (1988 & Supp. II 1990), and those outside United States territory will not likely gain review under the APA, see HRC v. Baker II, 953 F.2d at 1505-1507. It is unlikely that Congress would have granted rights under § 243(h)(1) to aliens outside the United States without providing them a clear means to enforce these rights. This further supports a limitation of § 243(h)(1) relief to excludables and deportables to whom judicial review is available.
 
 
 185
 The legislative history also suggests that the territorial reach of § 243(h)(1) is co-extensive with § 208(a), a provision which establishes asylum procedures for "alien[s] physically present in the United States or at a land border or port of entry," i.e. deportables and excludables. 8 U.S.C. § 1158(a) (Supp.1992). Under the heading "Asylum and Withholding of Deportation," the House Report states that
 
 
 186
 Since 1968, the United States has been a party to the United Nations Refugee Protocol which incorporates the substance of the 1951 Convention of Refugees which seeks to insure fair and humane treatment for refugees within the territory of the contracting states.... The Committee Amendment conforms United States statutory law to our obligations under Article 33 [of the Convention] in two of its provisions: ... section 208 ... [and] section 243(h).
 
 
 187
 H.R. 608 at 17 (emphasis added). Thus, sections 208 and 243(h), respectively, meet the United States' international obligation to provide asylum procedures for, and not to deport or return, "refugees within the territory of the contracting states." Id. Case law, and a leading commentator, also read § 243(h)(1) as co-extensive with § 208(a). See HRC v. Baker, 789 F.Supp. at 1575 (citing INA § 208(a) for the proposition that plaintiff's claims under INA § 243(h) "must fail because the statutory rights and protections asserted are reserved, by the very terms of the statute, to aliens within the United States"); C. Gordon & S. Mailman, 1 Immigration Law and Procedure, § 1.03[a] at 1-33 (1991) ("[r]efugee status is available [pursuant to INA § 207] to individuals screened and selected outside the United States, while asylum [pursuant to INA § 208] and withholding of deportation [pursuant to INA § 243(h) ] are remedies available to those who have already reached our shores or borders and wish to secure permission to stay.")
 
 
 188
 C. Article 33 does not create an extraterritorial obligation.
 
 
 189
 Article 33 of the Convention relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), which the United States ratified when it acceded to the 1967 Protocol relating to the Status of Refugees, 19 U.S.T. 6223 ("Protocol"), further supports the conclusion that Congress intended to limit § 243(h)(1) to deportables and excludables who are within United States territory.
 
 
 190
 The Supreme Court has stated that "if one thing is clear from the legislative history of ... the entire 1980 [Refugee] Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees." INS v. Cardoza-Fonseca, 480 U.S. 421, 436, 107 S.Ct. 1207, 1215, 94 L.Ed.2d 434 (1987). Specifically, Congress intended § 243(h)(1), as amended, to be co-extensive with Article 33 of the Convention. Plaintiffs concede this point, see Plaintiffs Brief at 14 ("Congress intended § 243(h) to have the same meaning as Article 33 of the Refugee Convention"), the legislative history overwhelmingly supports it, see S.Rep. No. 96-256 at 20, reprinted in 1980 U.S.C.C.A.N. at 141, 161 (section 243(h) "is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol"); H.R. 608 at 17 ("[t]he Committee Amendment [to § 243(h) ] conforms United States statutory law to our obligations under Article 33"), and the Supreme Court has consistently taken this view, see INS v. Doherty, --- U.S. ----, 112 S.Ct. 719, 729, 116 L.Ed.2d 823 (1992) (Scalia, J., concurring); INS v. Stevic, 467 U.S. 407, 421, 104 S.Ct. 2489, 2496, 81 L.Ed.2d 321 (1984). Thus, if Article 33 extends only to aliens within the territory of a contracting state, as I believe it does, this powerfully supports a parallel reading of § 243(h)(1). In turning to Article 33, I also address plaintiffs' (and the majority's) erroneous contention that Article 33 itself creates extraterritorial obligations for the United States. See Majority Op. at 1362-1367.
 
 
 191
 Article 33 of the Convention reads as follows:
 
 
 192
 Article 33--Prohibition of expulsion or return ("refoulement ")
 
 
 193
 1. No Contracting State shall expel or return ("refouler ") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.
 
 
 194
 The majority's "plain language" approach to the word "return" as used in Article 33 treads the same path as its analysis of INA § 243(h)(1), see Majority Op. at 1363-1364, and leaves the same unresolved question as to where the Article prohibits "return" from. Unlike INA § 243(h)(1), however, Article 33 includes next to the word "return" the explanatory bracketed French term "refouler ". Refouler is not susceptible to a plain language analysis for, as the majority points out, French dictionaries provide conflicting definitions. Majority Op. at 1363. The majority itself fails to settle on a meaning for this word, concluding that it is "ambiguous." Majority Op. at 1365. We must, therefore, turn to the legislative history of Article 33 in order to determine the meaning of "refouler," and consequently of "return".
 
 
 195
 The Netherlands delegate, speaking at the second and final reading of the Draft Convention, graciously provides a precise definition:
 
 
 196
 Baron van BOETZELAER (Netherlands) recalled that at the first reading the Swiss representative had expressed the opinion that the word "expulsion" related to a refugee already admitted into a country, whereas the word "return" ("refoulement") related to a refugee already within the territory but not yet resident there. According to that interpretation, article 28 would not have involved any obligations in the possible case of mass migrations across frontiers--or of attempted mass migrations.
 
 
 197
 He wished to revert to that point, because the Netherlands Government attached very great importance to the scope of the provision now contained in article 33. The Netherlands could not accept any legal obligations in respect of large groups of refugees seeking access to its territory.
 
 
 198
 At the first reading the representatives of Belgium, the Federal Republic of Germany, Italy, the Netherlands and Sweden had supported the Swiss interpretation. From conversations he had since had with other representatives, he had gathered that the general consensus of opinion was in favour of the Swiss interpretation.
 
 
 199
 In order to dispel any possible ambiguity and to reassure his Government, he wished to have it placed on record that the Conference was in agreement with the interpretation that the possibility of mass migrations across frontiers or of attempted mass migrations was not covered by article 33.
 
 
 200
 There being no objection, the PRESIDENT ruled that the interpretation given by the Netherlands representative should be placed on record.
 
 
 201
 Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Record of the Thirty-Fifth Meeting, U.S. Doc. A/Conf. 2/SR.35 at 30 (1951) (emphasis added).
 
 
 202
 The Netherlands delegate's comments unambiguously restrict the terms "expel" and "return ('refouler ')" to aliens physically within the territory of the contracting state. Moreover, the definition of "return ('refouler ')" as "already within the territory but not yet resident there" appears to correspond to American usage of the term "excludable" which is "synonymous with non-resident ... [and] describe[s] the alien who has reached our border but has not been formally permitted to enter the country." Bertrand, 684 F.2d at 205 n. 1 (emphasis added).
 
 
 203
 While the majority cannot point to any lack of clarity in the statement of the Netherlands delegate, it finds ambiguous the "ruling" of the Conference President "that the interpretation given by the Netherlands's representative should be placed on the record." U.S. Doc. A/Conf. 2/SR.35 at 30. Judge Edwards, concurring in Haitian Refugee Center v. Gracey, 809 F.2d 794, 840 (D.C.Cir.1987), has found that this ruling constituted an "agree[ment]" among the delegates. While acknowledging Judge Edward's "thoughtful and scholarly concurrence," the majority concludes that it is "an equally-fair reading to see this passage as simply recording the views of a dissenting member." Majority Op. at 1365.
 
 
 204
 I am in accord with Judge Edwards. The President of the Conference premised his ruling on "[t]here being no objection," a finding which alone would indicate agreement. Additionally, the Conference recorded the Netherlands delegate's "interpretation," not his "views." Indeed, I cannot fathom why a member would seek to have his "views" formally recorded since that is accomplished by the transcript itself. Thus, I conclude with Judge Edwards that the Conference formally recorded the delegate's "interpretation" so as to show its agreement.
 
 
 205
 The discussion which immediately followed the President's ruling clears up any residual ambiguity:
 
 
 206
 MR. HOARE (United Kingdom) remarked that the Style Committee had considered that the word "return" was the nearest equivalent in English to the French term "refoulement '. He assumed that the word "return" as used in the English text had no wider meaning.
 
 
 207
 The PRESIDENT suggested that in accordance with the practice followed in previous Conventions, the French word "refoulement " ("refouler " in verbal uses) should be included in brackets and between inverted commas after the English word "return" wherever the latter occurred in the text.
 
 
 208
 He further suggested that the French text of paragraph 1 should refer to refugees in the singular....
 
 
 209
 The two suggestions made by the President were adopted unanimously.
 
 
 210
 U.N. Doc. A/Conf. 2/SR.35 at 30-31 (emphasis added).
 
 
 211
 These statements evidence the delegates' unanimous agreement that "return ('refouler ')" be limited to non-resident aliens within a contracting state's territory. Only by reading Mr. Hoare's "refouler " as different from Baron van Boetzelaer's can one escape this conclusion. Both, however, were attending the same conference, and Mr. Hoare, who spoke immediately following the Baron, expressed no disagreement with his interpretation. Thus, there is no basis to suggest that they were interpreting the word differently. This negotiating history is to me unambiguous. Moreover it is, to my knowledge, the only document which directly explains the placement of "refouler" in Article 33; consequently, it is the linch-pin to understanding the word "return" as utilized in that provision.
 
 
 212
 Article 40 of the Convention, incorporated by reference in Article 7.4 of the Protocol, see Protocol, 19 U.S.T. at 6228, supports the same, limited reading of Article 33. Article 40, entitled "Territorial application clause," provides that
 
 
 213
 (1) Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the State Concerned.
 
 
 214
 189 U.N.T.S. 150. Thus, pursuant to Article 40, the Convention does not automatically reach beyond a contracting state's sovereign territory even to those other territories, such as colonies, which it administers. Nothing in Article 40 exempts Article 33 from this proviso. It follows that Article 33 does not, as the majority contends, extend automatically to aliens throughout the globe. I note parenthetically that the United States has taken no action pursuant to Article 40.
 
 
 215
 I conclude that Article 33, which plaintiffs concede to have the same territorial reach as § 243(h)(1), applies only to aliens physically within the territory of a given state. Most commentators adopt this view. See Aga Khan, Legal Problems Relating to Refugees and Displaced Persons, 149 Recuil Des Cours (Hague Academy of International Law) 287, 318 (1976) (only refugees "already within the territory of the Contracting State" may avail themselves of right to non-refoulement ); Weis, The United Nations Declaration on Territorial Asylum, 7 Canadian Yearbook Int'l L., 92, 123-24 (1969) (adopting Netherlands delegate's interpretation of "expel" and "return"); Note, The Right to Asylum Under United States Law, 80 Colum.L.Rev. 1125, 1126-27 (1980) (rights under Article 33 of the Convention "do[ ] not extend to refugees outside the contracting country's borders.").
 
 
 216
 D. Congress has authorized the President's policy.
 
 
 217
 Plaintiffs assert that even if the President's actions do not contravene § 243(h)(1) and Article 33, they are nonetheless without legal authority. The government, in response, relies on INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f), 1185(a)(1) (1988), which read as follows:
 
 
 218
 § 1182(f) [INA § 212(f) ] Suspension of entry or imposition of restrictions by President. Whenever the President finds that the entry of any aliens or of any class of aliens would be detrimental to the United States, he may ... suspend the entry of all aliens ... or impose on the entry of aliens any restrictions he may deem appropriate."
 
 
 219
 § 1185(a)(1) [INA § 215(a)(1) ]. Travel Control of citizens and aliens
 
 
 220
 (a) Restrictions and prohibitions. Unless otherwise ordered by the President, it shall be unlawful--(1) for any alien to depart from or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe....
 
 
 221
 The majority dismisses these provisions on the grounds that the President's authority to regulate "entry" does not permit him to "return" refugees to Haiti. Majority Op. at 1366. The majority's attempt to distinguish between entry restrictions and repatriation, however, does not withstand scrutiny. In the context of this case the two policies are inextricably intertwined. As the record makes clear, most Haitians seeking entry set sail on the 600 mile ocean voyage in overcrowded, unseaworthy craft with a demonstrable risk to life (evidenced in one case by a May 17, 1992 capsizing with a loss of half of the boat's forty passengers). The President cannot simply draw a "line in the sea" over which no Haitian vessel may cross. To do so would risk additional sea disasters with the attendant loss of life. Faced with this difficult policy choice which, I note, courts are without competency to evaluate, Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948), the President has determined that the only feasible way to regulate "entry" is to promptly interdict and repatriate Haitian vessels. Congress' broad delegation of the power to "impose on the entry of aliens any restrictions [the President] may deem appropriate," 8 U.S.C. § 1182(f) (1988), and to establish "reasonable ... orders" regulating entry, 8 U.S.C. § 1185(a)(1) (1988), easily encompass this policy choice.
 
 
 222
 Insofar as the majority relies on the assertion that the government may be interdicting Haitians seeking entry to countries other than the United States, Majority Op. at 1367, I note that this issue is not properly before our Court. As plaintiffs themselves state: "[t]his case ... [involves] defendants' blanket decision to implement an immigration policy ... in massive disregard for [plaintiffs'] asylum claims." Plaintiff's Brief at 30 (emphasis added). The plaintiffs in this case are seeking asylum in, and thus "entry" into, the United States. This litigation does not properly present the question of aliens seeking passage to other nations.
 
 
 223
 Accordingly, INA § 212(f) and § 215(a)(1) fully authorize the challenged Presidential action. Even if Congress had not authorized the May 23, 1992 policy, I would find sufficient authority in the President's inherent powers over immigration, see Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950), and foreign affairs, see United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936).
 
 
 224
 E. Conclusion.
 
 
 225
 The legislative history of § 243(h)(1), including as it must Article 33 and its negotiating history, clears up the textual ambiguities in this case and demonstrates conclusively that the United States' duty of non-refoulement pertains only to deportable and excludable refugees physically present in its territory and does not reach those, such as plaintiffs, who are on the high seas. Thus, the INA does not prohibit the May 23, 1992 policy; rather, it authorizes it in §§ 212(f) and 215(a)(1). "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum for it includes all that he possesses in his own right plus all that Congress can delegate." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Faced with such combined Presidential and Congressional authority, I would deny plaintiffs' request for injunctive relief.
 
 
 226
 I am strengthened in this conclusion by the well-established judicial reticence, in the absence of a clear legal mandate, to grant relief which would undermine the President's authority in foreign affairs. See Dep't of Navy v. Egan, 484 U.S. 518, 529-30, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988); Haig v. Agee, 453 U.S. 280, 290-92, 101 S.Ct. 2766, 2773-74, 69 L.Ed.2d 640 (1981); Chicago & Southern Airlines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 109-11, 68 S.Ct. 431, 435-36, 92 L.Ed. 568 (1948); see generally, United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315-22, 57 S.Ct. 216, 218-22, 81 L.Ed. 255 (1936). The interdiction and return policy embodied in the May 23, 1992 Order was not confined to an immigration crisis but was squarely in the foreign affairs arena. To be sure, the dramatic surge in Haitian migration following the September 30, 1991 coup that overthrew the democratically elected government of Bertrand Aristide and that led to 34,000 interdictions from October 1991 through May 1992 (as compared with 25,000 interdictions over the previous decade) precipitated an immigration crisis of substantial dimension. However, according to Under Secretary of State Kantor in a May, 1992 affidavit filed in this action, the massive migration outflow also gave the de facto Haitian government leverage against those nations who, like the United States, were pressing for a return to democracy in Haiti.
 
 
 227
 In a January 1992 affidavit filed in the HRC v. Baker litigation, Assistant Secretary of State Aronson cited "credible" reports that the de facto Haitian government "intend[ed] to encourage massive outmigration" in order to pressure the United States and the Organization of American States "into dropping their concerted efforts ... to restore constitutional democratic government in Haiti." Thus, the May 23, 1992 Order was part of the United States' response to a foreign policy crisis, and accordingly deserves "the utmost deference." United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).
 
 
 228
 Finally, while I do not rely on it because I see no need to do so in light of the clear purposes underlying the 1980 amendments to § 243(h)(1), I note that the presumption against extraterritorial application of domestic legislation also weighs against plaintiffs' claim. See EEOC v. Arabian Am. Oil Co., --- U.S. ----, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991).
 
 
 229
 I respectfully dissent.